567 S.E.2d 597

**In re: BRANDON LEE B.**

**Jerry L. S., II and Lisa A. S.,
Current Foster Parents,
Intervenors Below.**

No. 29701.

Supreme Court of Appeals of
West Virginia.

Submitted Oct. 2, 2001.

Decided Dec. 7, 2001.

Concurring and Dissenting Opinion of
Justice Albright Dec. 11, 2001.

Sidney H. Bell, Prosecuting Attorney,
Welch, Darrell V. McGraw, Jr., Attorney
General, Charlene Vaughan, Deputy Attor-

ney General, Charleston, for Appellant West Virginia Department of Health and Human Resources.

Gerald R. Linkous, Esq., Princeton, Guardian ad Litem.

Floyd A. Anderson, Steven K. Mancini, McDowell County Public Defender's Office, Welch, for Carrie Q.B., Mother.

Gloria M. Stephens, Esq., Welch, for Ahmed A., Father.

Jann E. Hoke, Esq., Branchland, for Intervenors.

PER CURIAM.

This is an appeal by the West Virginia Department of Health and Human Resources from an order of the Circuit Court of McDowell County dismissing a child abuse and neglect action and directing that Brandon Lee B., the infant named in the petition, be returned to his mother. On appeal, the Department of Health and Human Resources argues that the evidence in the case is clear and convincing that Brandon Lee B.'s mother has neglected him, and is unfit to have custody of him, and that under the circumstances, the circuit court erred in dismissing the Department's petition.

I.

FACTS

On October 22, 1999, the relator, Brandon Lee B., was born three months premature. At the time of birth, he weighed one pound, two ounces, and subsequent to his birth, he spent several months in intensive care at Women and Children's Hospital in Charleston, West Virginia.

Brandon Lee B.'s mother, Carrie Q.B., is from Fort Wayne, Indiana. Apparently, while living in a juvenile group home, she established a relationship with Brandon Lee B.'s putative father, Ahmed A., an Iraqi immigrant, and as soon as she turned 18, she moved into Ahmed A.'s home.

While in the home of Ahmed A., Carrie Lee B. became involved in a series of acts of physical violence, which included a domestic assault on Ahmed A. One of the instances resulted in Carrie Lee B. being charged with felony battery upon a police officer.

At length, Ahmed A. drove Carrie Q.B., who was then pregnant with Brandon Lee B., to McDowell County, West Virginia, where she hoped to live with her biological parents. Shortly after meeting her biological parents, Carrie Q.B. met Cecil Lee B., a McDowell County man who was a total stranger. The next day, she married him. The marriage was not successful, and Carrie Q.B. sought refuge at an abuse shelter near Welch, West Virginia.

It became apparent that Carrie Q.B. was going to give birth to Brandon Lee B. prematurely, and she was transferred to Women and Children's Hospital at Charleston, West Virginia, where Brandon Lee B. was born on October 22, 1999. After Brandon Lee B.'s birth, Carrie Q.B. returned to McDowell County, and Brandon Lee B. remained in intensive care at Women and Children's Hospital.

The evidence in the present case shows that for six weeks after Carrie Q.B. returned to McDowell County, a social worker unsuccessfully begged her to return to Charleston to bond with Brandon Lee B. and to authorize various medical procedures for him.

At length, Carry Q.B. agreed to return to Charleston, and arrangements were made for her to live at the Ronald McDonald House in Charleston and be with the child. However, the day before she was to report to Charleston, she called an emergency communications center to report that warrants were pending against her in Indiana and arranged for her own arrest. She subsequently appeared in the Circuit Court of McDowell County and waived her right to contest extradition and returned to Indiana in custody.

After Carrie Q.B. failed to report to Charleston, the West Virginia Department of Health and Human Resources filed a child neglect and abandonment petition. After receiving the petition, the circuit court made a preliminary finding of neglect and abandonment and awarded temporary legal and physical custody of Brandon Lee B. to the Department of Health and Human Resources on December 29, 1999. The court continued

the proceedings for three months because Carrie Q.B. remained in jail. Subsequently, in March 2000, Carrie Q.B. entered guilty pleas to a felony charge of battery upon a police officer and the misdemeanor offense of domestic assault in Indiana, and she was placed on probation.

After Carrie Q.B. was placed on probation, her adoptive parents returned her to West Virginia, and on March 29, 2000, she visited Brandon Lee B. and his foster parents for an hour and a half. It appears that that visit was initiated by Carrie Q.B.'s parents. Carrie Q.B. did not again visit with Brandon Lee B. until she attended the adjudicatory hearing in the present proceeding on October 12, 2000.

On April 13, 2000, the Department of Health and Human Resources amended the child abuse and neglect petition and alleged that Carrie Q.B. was unfit to parent Brandon Lee B. safely, given his special needs. An adjudicatory hearing was set on the petition for June 28, 2000. Carrie Q.B. failed to appear at that hearing, and her attorney advised the court that he had received no communication from her for a lengthy period of time and that she had provided him with no new address or telephone number. As a consequence, the adjudicatory hearing was continued to October 12, 2000.

On October 12, 2000, the West Virginia Department of Health and Human Resources presented evidence relating to the fitness of Carrie Q.B. to have custody of Brandon Lee B. Among other things, the evidence showed that Carrie Q.B. had a history of mental illness, of fetal alcohol syndrome, of oppositional defiant disorder, of post-traumatic stress disorder, of dissociative disorder, of bulimia, of dysthymia and of a borderline personality disorder. Carrie Q.B.'s adoptive mother testified that Carrie Q.B. was unpredictable and that she engaged in risky and reckless behavior including running away from home, numerous suicide attempts and violent relationships with men. Carrie Q.B.'s adoptive mother also testified that she believed that Carrie Q.B. could not be trusted to take care of herself, and that she was certainly not fit to care for a child with Brandon Lee B.'s special needs.

Child Protective Services workers testified that Brandon Lee B. had engaged in a life or death struggle while in intensive care at Women and Children's Hospital and that while he was engaged in that struggle, they had attempted without success to generate some interest in him from Carrie Q.B. Additionally, one of the workers testified that during her hour and a half visit with Brandon Lee B. on March 29, 2000, Carrie Q.B. had to be told how to hold Brandon Lee B., and further had to be told not to try to force him to accept pacifier when he did not want it. The social worker explained that Carrie Q.B. did not request another visit after the March 29, 2000, visit and in the next few months the worker could not maintain contact with her despite substantial efforts on his part.

Additional evidence adduced during the hearing included a negative home study of Brandon Lee B.'s birth father's home and evidence that the father could not attend the hearing because the father needed surgery to close a knife wound.

At the conclusion of the hearing, the circuit court ordered the record held open for an additional 15 days to allow any party to supplement the record with additional evidence.

During the 15–day period, the Department of Health and Human Resources filed medical reports which indicated that Brandon Lee B. had a crucial need for committed caretakers who could follow prescribed physical therapy and a special feeding regime. Records were also filed describing Carrie Q.B.'s mental limitations and emotional problems.

At the end of the 15–day period, the circuit court ordered that the child abuse and neglect petition be dismissed. In the order dismissing the case, the court recognized that the evidence relating to Carrie Q.B.'s ability to parent Brandon Lee B. was generally negative. The court stated: "To be blunt, the Mother, even when she is making her best efforts, is only minimally able to adequately take care of her own self, much less a small 'special needs' baby." The court, however, went on to say that W. Va.Code 49–6–2(c) required that a finding of neglect or abuse be based "upon conditions existing at

the time of the filing of the Petition." In analyzing the evidence, the court, in effect, found that much of the evidence relating to Carrie Q.B.'s inability to care for Brandon Lee B. involved incidents and conditions which arose after the filing of the Department of Health and Human Resources' petition. In view of this, the court reached the conclusion that the Department of Health and Human Resources had not met the burden established by W. Va.Code 49–6–2(c).

In the present proceeding, the Department of Health and Human Resources contends that the circuit court erred in holding that it had not met its burden and erred in not granting its petition in this case.

## II. .

### STANDARD OF REVIEW

■ In *In Re: Beth Ann B.*, 204 W.Va. 424, 513 S.E.2d 472 (1998), this Court indicated that in a child abuse and neglect case the Court employs the two-pronged standard of review set forth in Syllabus Point 1 of *McCormick v. Allstate Insurance Company*, 197 W.Va. 415, 475 S.E.2d 507 (1996):

> When this Court reviews challenges to the findings and conclusions of the circuit court, a two-prong deferential standard of review is applied. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.

## III.

### DISCUSSION

Although W. Va.Code 49–6–2(c) requires the West Virginia Department of Health and Human Resources in a child abuse or neglect case to prove conditions existing at the time of the filing of the petition, this Court has indicated that a petition may be amended at any time before the final adjudicatory hearing. *State v. Julie G.*, 201 W.Va. 764, 500 S.E.2d 877 (1997). Specifically, in Syllabus Point 4 of *State v. Julie G.*, *id.*, the Court stated:

Under Rule 19 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, amendments to an abuse/neglect petition may be allowed at any time before the final adjudicatory hearing begins. When modification of an abuse/neglect petition is sought, the circuit court should grant such petition absent a showing that the adverse party will not be permitted sufficient time to respond to the amendment, consistent with the intent underlying Rule 19 to permit liberal amendment of abuse/neglect petitions.

In *State v. Julie G.*, *id.*, the Court noted that the circuit court believed that it was required to disregard facts that supported the initial concerns of the Protective Services worker because such facts were not discovered until after the filing of the petition. The Court indicated that this belief was erroneous and that the allegations in the petition should have been evaluated in light of the evidence of the mother's performance after the filing of the petition, but during the pre-adjudication period.

Unlike the situation in *State v. Julie G.*, *id.*, the court in the present case actually amended the petition to include in the scope of concern the conduct of Brandon Lee B.'s mother, Carrie Q.B., after the filing of the original petition.

■ Although *State v. Julie G.* indicates that a child abuse or neglect case must be decided upon conditions existing at the time of the filing of the petition, or, by implication, in a case such as the present case, the amended petition, the clear import of *State v. Julie G.* is that facts developed after the filing of the petition, or amended petition, may be considered in evaluating the conditions which existed at the time of the filing of the petition or amended petition.

■ The clear thrust of the petition and amended petition in the present case is that Carrie Q.B. is unfit to be the mother of Brandon Lee B., especially in light of his need for medical and special nutritional care. The evidence adduced during the case shows that the health and possibly the very life of Brandon Lee B. depend upon his receiving appropriate and consistent medical and nutri-

tional care. Although he apparently was receiving such care at the time of the filing of the petition, the care was being provided by the Department of Health and Human Resources rather than Carrie Q.B. The evidence subsequently developed, in this Court's view, clearly and convincingly shows that Carrie Q.B. at the time of the filing of the petition lacked, and still lacks, the stability, maturity, judgment and discipline necessary to provide the consistent care which Brandon Lee B. requires. Rather clearly, Carrie Q.B. has been unable to establish a stable home situation even for herself. At very best, she has demonstrated only a sporadic interest in Brandon Lee B., and she has demonstrated little initiative in establishing a relationship with Brandon Lee B. A fair reading of the record shows that she has been sporadic, at best, in maintaining any kind of contact with the parties involved in the life of Brandon Lee B.

Additionally, the record shows that Carrie Q.B. has a history of mental and emotional problems, that she has had minor problems with the criminal system, and that she needs assistance with her own life.

In *State v. Krystal T.*, 185 W.Va. 391, 407 S.E.2d 395 (1991), this Court indicated that parents who do not adequately provide for a child's needs and are not sufficiently motivated or organized to provide for such needs on an ongoing basis should have their parental rights terminated.

This Court believes that the evidence does rather clearly show that Brandon Lee B.'s mother, Carrie Q.B., is not sufficiently motivated or organized to provide for Brandon Lee B.'s needs and that the evidence is sufficient to support a termination of her parental rights.

█ After examining the decision of the circuit court in this matter, this Court believes that the circuit court also essentially reached this conclusion. However, the Court believes that the circuit court erred in con-cluding that it could only consider the conduct of Carrie Q.B. at the time of the filing of the petition or prior thereto in determining the fitness of Carrie Q.B. to have custody of Brandon Lee B.

For the reasons stated, the judgment of the circuit court is reversed, and this case is remanded to the Circuit Court of McDowell County with directions that the circuit court terminate the parental rights of Carrie Q.B. to Brandon Lee B.

Reversed and remanded.

ALBRIGHT, Justice, concurring in part and dissenting in part.

(Filed Dec. 11, 2001)

I concur with the majority's determination that the decision of the lower court in this matter should be reversed. The Department of Health and Human Resources presented evidence in the adjudicatory phase sufficient to warrant a finding of neglect. The determination of the appropriate next step, however, is the focus of my disagreement with the majority opinion.

While the extreme circumstances of this case may indeed warrant termination of parental rights, that determination must be made in conformity with the procedures outlined in the West Virginia Code, the West Virginia Rule of Procedure for Child Abuse and Neglect Proceedings, and the numerous opinions authored by this Court. As an appellate tribunal, this Court does not have authority to issue such a determination where the lower court has not proceeded to the dispositional hearing phase.[1] The timely, effective, and detailed procedures enumerated by statute, rule, and judicial opinion must be observed. As this Court so distinctly stated in syllabus point two of *In re Beth Ann B.*, 204 W.Va. 424, 513 S.E.2d 472 (1998), "In a child abuse and/or neglect proceeding, even where the parties have stipulated to the predicate facts necessary for a

---

1. As this Court stated in *In re Beth Ann B.*, 204 W.Va. 424, 513 S.E.2d 472 (1998),

   The statutory scheme applicable in child abuse and neglect proceedings provides for an essentially two phase process. The first phase culminates in an adjudication of abuse and/or neglect. The second phase is a dispositional one, undertaken to achieve the appropriate permanent placement of a child adjudged to be abused and/or neglected.

   *Id.* at 427, 513 S.E.2d at 475 (citations omitted).

termination of parental rights, a circuit court must hold a disposition hearing, in which the specific inquiries enumerated in Rules 33 and 35 of the *Rules of Procedure for Child Abuse and Neglect Proceedings* are made, prior to terminating an individual's parental rights."

This Court explicitly stated in syllabus point two of *In re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973), that this is an issue of constitutional dimension: "West Virginia Code, Chapter 49, Article 6, Section 2, as amended, and the Due Process Clauses of the West Virginia and United States Constitutions prohibit a court or other arm of the State from terminating the parental rights of a natural parent having legal custody of his child, without notice and the opportunity for a meaningful hearing."

This Court has characterized a dispositional hearing as a "mandatory prerequisite" to the termination of parental rights. *Beth Ann B.,* 204 W.Va. at 428, 513 S.E.2d at 476. In our recent decision in *State ex rel. Chastity D. v. Hill,* 207 W.Va. 358, 532 S.E.2d 358 (2000), we held that "even where there are written relinquishments of parental rights, the circuit court is required to conduct a disposition hearing, pursuant to West Virginia Code § 49-6-5 (1999) and Rules 33 and 35 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings...." *Id.* at 364, 532 S.E.2d at 364.

These rules and statutory guidelines are essential, and this Court has consistently treated them as mandatory. In syllabus point five of *In re Edward B.,* 210 W.Va. 621, 558 S.E.2d 620 (2001), this Court recently explained as follows:

> Where it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected has been substantially disregarded or frustrated, the resulting order of disposition will be vacated and the case remanded for compliance with that process and entry of an appropriate dispositional order.

Neither the lower court system nor the Department of Health and Human Resources should interpret the majority decision as an excuse to disregard the guidance provided by this Court or the requirements enumerated by statute and rule with regard to dispositional hearings. Egregious facts adduced on the issue of disposition may indeed justify termination of parental rights. However, it is not a determination to be made here at this time. This Court should require adherence to the procedural and substantive protections provided by the Constitution, our statutes, court rules and cases. Accordingly, I respectfully dissent from the portion of the majority opinion which directs the lower court to terminate parental rights. To comply with the mandates of statute, rule, and this Court, the lower court must hold a dispositional hearing prior to termination.

I am authorized to state that Justice Starcher joins in this concurring and dissenting opinion.