# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

*In re* **D.P., G.P., and S.P.**

**No. 20-0114** (Wood County 19-JA-95, 19-JA-96, 19-JA-97)

**FILED**

**September 3, 2020**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Father M.C., by counsel Michele Rusen, appeals the Circuit Court of Wood County's January 8, 2020, order terminating his parental rights to D.P., G.P., and S.P.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem, Jeffrey B. Reed, filed a response on behalf of the children in support of the circuit court's order. Petitioner filed a reply. On appeal, petitioner argues that the circuit court erred in adjudicating him upon allegations not contained in the petition and upon insufficient evidence, denying him a post-adjudicatory improvement period, and denying him post-termination visitation with the children.[2]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2]On appeal, petitioner does not raise an assignment of error specifically challenging the termination of his parental rights to the children. He does, however, in one sentence of his assignment of error related to adjudication, assert that termination of his parental rights should be reversed because adjudication was inappropriate. Because we find no error in petitioner's adjudication, as more fully set forth below, we find it unnecessary to address the termination of petitioner's parental rights, especially in light of petitioner's failure to attack the termination independently.

1

reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In May of 2019, the DHHR filed an abuse and neglect petition that alleged several different grounds against petitioner, including domestic violence in the home. Specifically, the petition alleged that law enforcement and Child Protective Services ("CPS") responded to a domestic violence altercation at petitioner's residence on May 19, 2019. According to the petition, law enforcement informed CPS that petitioner had been arrested for assaulting his live-in girlfriend after he "held [his girlfriend] in the attic against her will and was confronting her about possible drug use." The petition alleged that law enforcement photographed an injury to the girlfriend sustained when petitioner slapped her. According to petitioner's girlfriend, petitioner was intoxicated during the incident and the children "were in the next room." The girlfriend also indicated that petitioner had a drinking problem. Petitioner's neighbor spoke with CPS, confirmed that she heard the altercation, and also told CPS that petitioner "drinks too much." The petition also alleged that petitioner's parental rights to three other children were previously involuntarily terminated in three separate abuse and neglect proceedings, two in Ohio and one in West Virginia. Further, the DHHR received prior referrals regarding the children at issue in this appeal, and the children were involved in a prior abuse and neglect proceeding that resulted in the involuntary termination of the mother's parental rights. Subsequent to that termination, the DHHR received two additional referrals in regard to these children and the father's conduct. According to the petition, these referrals were based upon the children having lice and inappropriate clothing, in addition to the father's alcohol abuse and permitting the mother to be around the children despite the termination of her parental rights and denial of post-termination visitation. In November of 2018, the DHHR began providing services that continued through May of 2019, when the petition in the underlying matter was filed. Following the petition's filing, petitioner waived his preliminary hearing.

In July of 2019, the circuit court held an adjudicatory hearing, during which several witnesses testified. The first was Patrolman Austin Davis of the Parkersburg Police Department, one of the officers who responded to the domestic violence incident at petitioner's home on May 19, 2019. Patrolman Davis indicated that when he arrived, petitioner was "yelling and screaming" and had to be calmed down to speak with law enforcement. Patrolman Davis then entered the residence to speak with petitioner's girlfriend, who was "visibly upset" and displayed injuries on her right arm. Based upon Patrolman Davis's discussion with the girlfriend, petitioner was arrested for domestic battery.

The DHHR also called as a witness one of the girlfriend's friends who was present the altercation at issue. According to the friend, she and petitioner's girlfriend were looking for a comforter in the attic of the residence on the night in question, along with the friend's ex-boyfriend's child, when petitioner returned home. The friend testified that she believed petitioner had been drinking. Petitioner entered the attic screaming and angry, immediately threw an object at his girlfriend, and then engaged in an altercation with her. The friend attempted to leave the attic because petitioner's conduct was upsetting the child who accompanied her. According to the friend, she asked petitioner to let her leave with the child, but he refused. Instead, petitioner blocked the door, called 9-1-1, and "was screaming that [the girlfriend] was gonna [sic] kill him." The friend testified that petitioner similarly would not let his girlfriend leave the attic and,

in fact, shoved her when she attempted to leave. According to the witness, as the girlfriend became increasingly angry she grabbed items, such as a lid to a storage bin and a skillet, and tried to strike petitioner with them. Finally, as the situation escalated and the child accompanying the friend became "very hysterical and very upset," petitioner allowed the friend and the child to leave the attic. The friend also testified to at least one past incident in which petitioner and the girlfriend yelled at one another during an argument in the children's presence.

Petitioner's downstairs neighbor testified that after hearing a disturbance in petitioner's residence on the night in question, she messaged petitioner and then entered his residence. The neighbor testified that upon entering she encountered the minor child accompanying the girlfriend's friend, who was "bawling her eyes out" and said that petitioner was "flipping out." According to the neighbor, the children were in their room sleeping at this time. The neighbor eventually left the residence, but later the friend and the child accompanying her came to the neighbor's residence and stated that petitioner was attacking his girlfriend and had "her held hostage," before asking the neighbor to contact 9-1-1, which she did. The neighbor also testified about at least five other incidents in which petitioner was drinking and "yelling and cursing" in the residence at times when the children were home.

The CPS worker who responded to petitioner's home on the night in question testified that she also observed an injury to the girlfriend's right arm. According to the CPS worker, petitioner was in police custody at the time of her arrival, which necessitated the children's emergency removal.

Petitioner's girlfriend then testified to the incident in question. According to the girlfriend, when petitioner entered the attic he was mad and had been drinking. She further corroborated her friend's testimony that petitioner would not let either of them exit the attic and that petitioner's behavior upset the child in the attic, who was crying during the altercation. The girlfriend called her mother and informed her that petitioner would not let her leave the attic. The girlfriend also admitted to physical contact with petitioner when she charged at him in an attempt to exit the attic. The girlfriend testified that the altercation took place so quickly that she couldn't recall exactly what happened, other than she "was on [her] feet one minute and . . . was off [her] feet the next minute." She also confirmed that she had marks "all over" and that the next day she "had even more bruises." She also testified that petitioner previously "took his fist and busted my window out" at her prior residence in the presence of petitioner's children, which caused her to call the police. Finally, she testified to a history of police intervention in arguments between her and petitioner.

Petitioner then called several witnesses before testifying himself. According to petitioner, he discovered that his girlfriend was abusing methamphetamine on the day in question and confronted her about it in the attic. Petitioner testified that his girlfriend became aggressive, hit him several times, tried to push him down the steps, and threatened to kill him. He further alleged that the girlfriend "beat[] [him] in the head" with a frying pan. According to petitioner, he continued in the altercation by restraining the girlfriend and eventually calling 9-1-1. Instead of leaving the attic, petitioner testified that he "finally connect[ed] with 9[-]1[-]1 after trying to keep [his] phone away from [the girlfriend] and still fight this doorway and not get shoved down these steps." He additionally testified that he did not prevent his girlfriend's friend or the child

3

accompanying her from leaving the attic, although he did admit that he was blocking their exit. Eventually, petitioner exited the attic to wait on law enforcement. Petitioner also admitted that on the day in question he left a ten-year-old child to supervise his children for approximately six hours. Petitioner further testified to having previously obtained a domestic violence protective order against the girlfriend based, in part, upon allegations that she hit him, threatened him, and threw a ladder at him in the children's presence. Petitioner admitted, however, that he withdrew the petition for the order within five days of it being granted.

At the adjudicatory hearing, the circuit court noted that "[w]e got into a lot of issues that aren't really in the petition, but the big issue was the issue of the children being exposed to domestic violence and obvious emotional harm to children exposed to domestic violence." The DHHR then argued that petitioner "agreed that there have been at least three, possibly four incidents of domestic violence" that occurred in the home shortly before the petition's filing and that petitioner "admitted that the children have been present for at least three of those." The circuit court found that "regardless of who the aggressor was in the various incidents," the DHHR "established that there were multiple incidents of domestic violence within the home that exposed the children to emotional distress and abuse." While the circuit court acknowledged that it was unclear if the children heard the incident on May 19, 2019, "we know they were present for some of the incidents, and we can assume the whole atmosphere in the home had a negative effect on the children." Accordingly, the circuit court adjudicated petitioner as an abusing parent.

Thereafter, petitioner moved for a post-adjudicatory improvement period, and the circuit court held two hearings on the motion, during which extensive evidence was presented. In denying petitioner's motion, the circuit court found that there was "overwhelming evidence of extensive interventions in both Washington County, Ohio, and Wood County, West Virginia, in attempts to provide [petitioner] with the necessary tools to be able to appropriately parent." These services began in 2006 in a proceeding that resulted in the termination of petitioner's parental rights to an older child upon evidence that he failed to attend mental health counseling and did not comply with the case plan, among other evidence. In 2007, petitioner's parental rights to an older child were again terminated after he made no progress toward completing the case plan. Additionally, in cases in 2012 and 2015, petitioner's repeated incarcerations resulted in other individuals being required to care for his children. Based on this evidence, the circuit court found that across cases in 2006, 2007, and 2012, petitioner was unable to provide a safe home for the children, especially in light of past instances of domestic violence. Further, the circuit court found that there had been repeated issues with the unsuitable conditions in petitioner's homes, which are the "same problems [that] continued to happen again and again, even though services had been offered again and again." The circuit court concluded that "[t]here is no showing that [petitioner] is ever going to be able to appropriately parent these children" and that he "is incapable of changing permanently." Based on this evidence, the circuit court found that "[y]et another improvement period would be fruitless and no additional services can be offered to remedy the circumstances" at issue. Because the circuit court found that petitioner had not demonstrated by clear and convincing evidence that he was likely to fully participate, it denied his motion for a post-adjudicatory improvement period.

The circuit court held the final dispositional hearing in December of 2019. Since petitioner does not challenge the termination of his parental rights, the evidence introduced in

4

that regard is not germane to this appeal. The circuit court did, however, take evidence regarding the issue of post-termination visitation. According to the children's therapist, post-termination visitation was not recommended because it "would make it difficult for the children to assimilate into the adoptive family and . . . would create instability" in the children's lives. The therapist further described the children's negative statements about petitioner, including G.P. expressing a belief that petitioner missed a visit with the children because "he probably chose to go hang out with somebody else instead of seeing us." Additionally, the therapist testified that D.P. stated that "[i]t would be a dream come true" not to return to petitioner's care or have continued contact with him. An adoption supervisor for the DHHR also testified that it "would be a huge hurdle for an adoption specialist to overcome to find [the children] a family if [petitioner was] awarded post-termination visits." Finally, the DHHR employee who supervised petitioner's visits with the children testified that she did not believe there was a strong emotional bond between petitioner and the children.

After finding that there was no reasonable likelihood petitioner could substantially correct the conditions of abuse and neglect and that termination of his parental rights was necessary for the children's welfare, the circuit court terminated petitioner's parental rights to the children. The court then considered the issue of post-termination visitation and highlighted the fact that for post-termination visitation to be granted, it must not be detrimental to the children. In reaching a determination on this issue, the circuit court found that it "cannot see where, in the testimony presented, that post-termination visitation would be in the children's best interests." Because of concerns over hindering permanent placement in an adoptive home, and because it found that petitioner and the children did not have a close emotional bond, the circuit court denied post-termination visitation between petitioner and the children. It is from the dispositional order that petitioner appeals.[3]

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

---

[3]The children's mother's parental rights were terminated in a prior proceeding. According to respondents, the permanency plan is adoption in the current foster home.

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner first asserts that the circuit court erred in adjudicating him because his adjudication was based on incidents of domestic violence other than the lone incident alleged in the petition and because there was no evidence that the children were aware of the instance of domestic violence alleged in the petition. According to petitioner, the DHHR's petition contained allegations related only to the incident on May 19, 2019, and to permit evidence of additional instances of domestic violence would be contrary to the requirement that the petition contain specificity as to time and place. We find, however, that this argument does not entitle petitioner to relief.

Petitioner is correct that West Virginia Code § 49-4-601(b), in relevant part, requires that "[t]he petition shall allege specific conduct including time and place, how the conduct comes within the statutory definition of neglect or abuse with references to the statute, any supportive services provided by the department to remedy the alleged circumstances, and the relief sought." Here, the record shows that the DHHR's petition was detailed and specific in regard to the events that occurred on May 19, 2019, concerning domestic violence in the home, a fact that petitioner does not challenge. Petitioner's argument concerning the additional evidence introduced at adjudication establishing other instances of domestic violence, however, ignores the fact that this Court has held that "facts developed after the filing of the petition, or amended petition, may be considered in evaluating the conditions which existed at the time of the filing of the petition or amended petition." *In re Brandon Lee B.*, 211 W. Va. 587, 590, 567 S.E.2d 597, 600 (2001). Contrary to petitioner's argument that the DHHR was prohibited from presenting evidence of other instances of domestic violence, or that the circuit court was prohibited from considering such evidence, it is clear that this evidence was properly admitted and considered.

As we have previously recognized,

"[West Virginia Code § 49-4-601(i)], requires the [DHHR], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing [evidence].' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the [DHHR] is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).

Syl. Pt. 1, *In re Joseph A.*, 199 W. Va. 438, 485 S.E.2d 176 (1997) (citations omitted). Here, the condition existing at the time of the petition's filing was domestic violence in the home. All of the evidence at adjudication concerning additional instances of domestic violence in the month leading up to the petition's filing clearly spoke to this condition, as it existed when the petition was filed. This is in keeping with *Brandon Lee B.*, as quoted above. Further, this Court has previously held that "[i]f the allegations of fact in a child neglect petition are sufficiently specific to inform the custodian of the infants of the basis upon which the petition is brought, and thus afford a reasonable opportunity to prepare a rebuttal, the child neglect petition is legally sufficient." Syl. Pt. 1, *State v. Scritchfield*, 167 W.Va. 683, 280 S.E.2d 315 (1981). The petition in this matter outlined the allegations against petitioner with specificity such that he was informed of the petition's basis and able to rebut the allegations against him. Therefore, any

argument advanced on appeal seeking to limit the circuit court's consideration of relevant evidence because it occurred on a date other than that set forth in the petition does not entitle petitioner to relief.

In support of this assignment of error, petitioner further argues that adjudication was erroneous because there was no evidence that the children were aware of the incident of domestic violence that occurred on May 19, 2019. Having determined that the circuit court properly considered evidence of other instances of domestic violence in the home, this argument is of no moment. As the circuit court found, the evidence established that there were multiple instances of domestic violence in the home and that the children witnessed some of these incidents. West Virginia Code § 49-1-201 defines "abused child" as

> [a] child whose health or welfare is being harmed or threatened by . . . [a] parent . . . who knowingly or intentionally inflicts, attempts to inflict, or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home.

We agree with the circuit court that the children's repeated exposure to domestic violence in the home constituted a threat to their mental or emotional wellbeing and constituted abuse on petitioner's part. As such, we find no error in the circuit court's adjudication of petitioner as an abusing parent.[4]

Next, petitioner argues that the circuit court erred in denying his motion for a post-adjudicatory improvement period. In support, petitioner argues that "the court essentially made the decision that [he] could not successfully complete an improvement period" and, in doing so, applied the wrong legal standard for the granting of an improvement period. This argument, however, ignores the fact that this Court has clearly held that "[t]he circuit court has the discretion to refuse to grant an improvement period when no improvement is likely." *In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). Petitioner is correct that in order to obtain an improvement period, West Virginia Code § 49-4-610 requires a parent to prove that they are likely to fully comply. However, he fails to recognize that entitlement to an improvement period is not absolute if this burden is satisfied, as clear from the authority above granting circuit court's discretion to deny improvement periods when no improvement is likely. As such, petitioner's argument regarding the circuit court's denial of his improvement period is predicated on a misapplication of the law and entitles him to no relief. This is especially true in light of the

---

[4]In support of this assignment of error, petitioner also asserts that the circuit court's adjudicatory order contained insufficient findings of fact and conclusions of law in regard to his adjudication as an abusing parent. However, Rule 27 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings clearly states that "[a]t the conclusion of the adjudicatory hearing, the court shall make findings of fact and conclusions of law, in writing *or on the record*, as to whether the child is abused and/or neglected in accordance with W. Va. Code § 49-4-601(i)." (Emphasis added). As the analysis above makes clear, the circuit court made detailed findings in regard to petitioner's abusive conduct. Accordingly, he is entitled to no relief in this regard.

circuit court's detailed findings regarding petitioner's long history of noncompliance in multiple abuse and neglect proceedings that resulted in the involuntary termination of his parental rights to three older children. As outlined above, these terminations were predicated, in part, upon petitioner's repeated failure to participate in services designed to remedy the conditions of abuse and neglect. As such, we find no abuse of discretion in the circuit court's finding that petitioner was incapable of making permanent change or in its denial of the motion for a post-adjudicatory improvement period. While petitioner attacks the circuit court's finding that there were no additional services that could remedy the conditions of abuse and neglect, it is clear that this finding was made in regard to petitioner's general inability to comply with services and make lasting improvement across multiple abuse and neglect proceedings. Therefore, we find that petitioner is entitled to no relief.

Finally, petitioner argues that it was error to deny his request for post-termination visitation. According to petitioner, he shared a strong emotional bond with the children and visits during the proceedings went well. As such, petitioner asserts that post-termination visitation would be appropriate. We disagree.

In addressing post-termination, the Court has directed as follows:

> "When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest." Syl. Pt. 5, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995).

Syl. Pt. 11, *In re Daniel D.*, 211 W. Va. 79, 562 S.E.2d 147 (2002). On appeal, petitioner repeatedly asserts that a strong emotional bond existed between him and the children, but the children's visitation supervisor testified that this was not the case. Further, this Court has routinely held that it is the children's best interests that control such decisions. *See Kristopher O. v. Mazzone*, 227 W. Va. 184, 192, 706 S.E.2d 381, 389 (2011) ("[T]he best interests of the child is the polar star by which decisions must be made which affect children."). As noted above, two witnesses testified that post-termination visitation would not be in the children's best interests and would, in fact, be detrimental to obtaining a stable, permanent placement for them in the form of an adoptive home. As such, we find no error in the circuit court's denial of post-termination visitation.[5]

---

[5]In support of this assignment of error, petitioner argues that the circuit court should have been barred from considering evidence about the children's wishes because the oldest child was seven years old at the time of disposition. According to petitioner, the law in this state limits the consideration of a child's wishes if they are younger than fourteen and not of appropriate maturity to express such wishes. This is, however, an incorrect interpretation of the statutes,

(continued . . . )

For the foregoing reasons, we find no error in the decision of the circuit court, and its January 8, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**:  September 3, 2020

**CONCURRED IN BY**:

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

---

rules, and caselaw governing abuse and neglect proceedings. It is true that West Virginia Code § 49-4-604(c)(6) requires that "the court shall give consideration to the wishes of a child 14 years of age or older or otherwise of an age of discretion as determined by the court regarding the permanent termination of parental rights." What petitioner ignores, however, is that this statute places an affirmative duty on the circuit court to consider a child's wishes in such circumstances, but it does not limit the circuit court's ability to hear relevant evidence in abuse and neglect proceedings. Here, the children's therapist testified to the children's concerns about continued contact with petitioner and, in some instances, their express preference for no additional contact. While the circuit court was not bound to consider these wishes under West Virginia Code § 49-4-604(c)(6) because of the children's ages and the lack of a finding that they were otherwise of an age of discretion, it was by no means precluded from considering this testimony. As such, petitioner is entitled to no relief in this regard.

9