STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS

**FILED**

**March 16, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* **P.H.**

**No. 20-0728** (Hampshire County 19-JA-49)


# MEMORANDUM DECISION


Petitioner Mother C.T., by counsel Jeremy B. Cooper, appeals the Circuit Court of Hampshire County's August 5, 2020, order terminating her parental rights to P.H.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem, Joyce E. Stewart, filed a response on behalf of the child in support of the circuit court's order. Petitioner filed a reply. On appeal, petitioner argues that the circuit court erred in taking adverse action against her—in the form of adjudication, denial of an improvement period, and termination of parental rights—based upon its erroneous application of this Court's holdings addressing physical abuse against children by an unknown perpetrator.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In October of 2019, the DHHR filed an abuse and neglect petition against petitioner and the father alleging that then-two-month-old P.H. suffered nonaccidental trauma while in their care. According to the DHHR, the parents brought the child to Hampshire Memorial Hospital because she was suffering seizures and did not want to take a bottle. The child was transferred to the intensive care unit at Ruby Memorial Hospital, at which point medical personnel discovered

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

that she had suffered two skull fractures, one on each side of her head, with multiple bleeds inside the brain tissue and several areas that appeared to indicate the child had suffered a stroke. According to the medical personnel, the child's injuries were consistent with someone hitting her on the head or having fallen down the stairs. According to the DHHR, petitioner, the father, and the child's grandparents were present but denied any trauma, including falling, that could have explained the injury. According to the father, he put the child to bed the night before her admission to the hospital and checked on her throughout the night. It was not until around 5:30 a.m. on the day of admittance that the father noticed that the child "was not acting herself." Additionally, petitioner informed the DHHR that the child was behaving normally the day before and that when she came home from work that night, the child was asleep on the couch. Petitioner also indicated that the child had seen a family nurse practitioner for a checkup two days prior to the admission. The only possible explanation the parents offered to medical personnel was that a cat jumped on the child and scratched her face two weeks prior. In fact, the child had dried blood on her face that the parents said was from the cat scratch, but the petition indicated that the blood would not have remained for two weeks. According to the DHHR's records, the father "wondered if his mom did anything" because he was certain that the parents did not injure the child. Further, medical personnel were unable to fully assess the child for additional fractures due to repeated seizures. The child's status at that time was extremely critical; she was sedated and placed on a ventilator. Ultimately, medical personnel determined that the child's injuries were consistent with nonaccidental trauma. During the DHHR's investigation, the parents offered several other possible explanations for the injuries, including that the family's dogs knocked the child over while in a walker, bumped into her cradle, or knocked her bouncy seat into the sofa. The parents also alleged that the child fell back against a wall while being photographed, though they did not note any injuries to the child and acknowledged that she did not act as if she was in pain. Following the petition's filing, petitioner waived her preliminary hearing.

The circuit court then held several adjudicatory hearings in January, March, and May of 2020, during which the DHHR presented extensive evidence from DHHR employees and several medical professionals who treated P.H. At the first dispositional hearing, two Child Protective Services ("CPS") workers testified consistently with the allegations in the petition. Specifically, one worker reiterated the facts surrounding the parents' care of P.H. in the days leading up to her admission. According to the first worker, the only other person who had been around the child in the days preceding admission was the child's paternal grandmother, R.H.,[2] who attended the child's medical appointment with petitioner. The worker testified that the only mention petitioner made of R.H. was that she attended this appointment. This worker testified that petitioner

---

[2]At various times in the record, R.H. is referred to differently in relation to the child, including references to her as either the maternal or paternal grandmother or even the paternal great-grandmother. The record shows, however, that the father specifically clarified the child's relationship to R.H. during one of the adjudicatory hearings below, indicating that she is the child's paternal grandmother. Regardless of the various manners to which she is referred in the record and in the briefs before this Court, in all instances it is clear that the parties are discussing R.H.

reported that she arrived home after leaving work at approximately 8:00 p.m. the night before the child's hospitalization and did not notice anything wrong with the child. However, petitioner informed the worker that the next morning she could see the child twitching, which was when the parents decided to seek medical treatment. According to the worker, the only explanation offered for the child's injuries was that they could have been caused by the family's dogs. Next, the second worker testified that the father gave conflicting accounts of whether anyone else had been around the child prior to her injuries. According to the worker, the father first indicated that no one had been around the child, then he indicated that "his grandma and [the mother's] grandma had watched the baby a handful of times," before finally indicating that R.H. babysat the child twice during the week of the admission. The worker spoke to petitioner, but did not testify to any information that petitioner provided as to how the child's injuries could have occurred. The worker also spoke with R.H., who initially denied caring for the child before acknowledging that she did provide care on two occasions during that week. R.H. further indicated that she previously suffered a stroke, and the worker noted that R.H. "seemed to be really hard to keep on task." The worker additionally indicated that during their discussion R.H. made at least one "[c]ompletely off the wall statement" about eating chili that was wholly irrelevant to their discussion. Further, the worker testified that once medical personnel were able to do a full skeletal scan, they found that P.H. suffered two broken ribs and a broken tibia in addition to her other injuries. According to the worker, these injuries were in various stages of healing. The worker further indicated that the child's family nurse practitioner informed her that he did not notice any signs of these injuries during her most recent visit two days prior to admission. Finally, the worker confirmed that the CPS investigation substantiated nonaccidental trauma and lack of supervision based upon the child's unexplained injuries.

At the second adjudicatory hearing, the DHHR introduced testimony from the attending physician in the pediatric intensive care unit at Ruby Memorial Hospital, Dr. Faraon, who also treated P.H. According to Dr. Faraon, the type of hemorrhages that the child suffered happen "if the baby suffers a blow to the head or if the baby is shaken or if the baby's head is squeezed." Dr. Faraon also indicated that the child's rib fractures were a few weeks old upon her admission and that this injury is normally sustained through trauma such as squeezing or blows. Dr. Faraon similarly testified that the child's broken tibia would likely have been the result of being hit or squeezed. Next, the psychologist who performed petitioner's psychological evaluation testified that the prognosis for petitioner was fair, given that the child suffered "such extensive injuries and no one noticed them" which caused "concern about [petitioner's] observation skills or whether she's overlooking certain things." The psychologist also testified that petitioner had the capacity to properly care for the child, provided that "she wasn't a direct cause of the injuries to the child or was aware of the injuries that were perpetrated by others." The evaluator also questioned petitioner's "overall judgment when it comes to making good decisions that are in the[] child's best interest."

At the third adjudicatory hearing, the child's family nurse practitioner testified that he examined the child two days prior to her hospitalization and that the child presented no complaints or discomforts. The child similarly did not display any of the injuries testified to by Dr. Faraon or any of the purported injuries caused by the cat that the parents described as happening two weeks prior to hospitalization. Petitioner also testified at the hearing and again stated that she and the father did not notice anything out of the ordinary about the child until the

3

morning of the hospitalization. According to petitioner, that morning the child would not eat and petitioner noticed that her arm was twitching. Petitioner also denied having seen bruising on the child's head, despite the fact that medical personnel noted the bruises upon the child's admission. As it relates to petitioner's argument on appeal, it is important to note that at no point during her testimony at the adjudicatory hearing did petitioner assert that R.H. caused the child's injuries.

Based upon this evidence, the circuit court found that the child suffered injuries that were the result of nonaccidental trauma while in the care of petitioner and the father. Further, the child displayed injuries in various stages of healing for which there was no plausible explanation or other efforts to identify the perpetrator thereof. In fact, the court found that the parents denied that any abuse occurred, despite evidence of obvious nonaccidental trauma. Of specific importance to the court was the testimony from Dr. Faraon that the bruising on the child's head indicated that the skull fractures occurred between twelve and twenty-four hours prior to her admission to the hospital, a timeframe in which the only persons the child was exposed to were the parents and R.H. During that period, R.H. watched the child for one hour. The court also addressed several of the parents' possible explanations for the child's injuries, including petitioner's assertion that they could have occurred when the child fell back into a wall from a seated position while the family was taking photographs, finding that all the explanations lacked credibility.

According to the circuit court, only the father testified that he suspected R.H. could have caused the child's injuries, although the court went on to point to various evidence that undermined this position. This included the fact that approximately two months after the petition was filed, R.H. suffered a medical issue; was hospitalized at the time of adjudication; and, according to the father and his sister, was "not doing well, medically." The court further noted that it was deeply concerned that the child's medical records noted that a paternal aunt called the hospital to inquire about the child's condition and possessed the code to be able to obtain this information, which had to have been provided by the parents. According to the records, the paternal aunt inquired of hospital staff whether the child's injuries could have been caused by a grandparent shaking the child. Based on the foregoing, the circuit court found that, although the parents informed CPS that they wondered if R.H. could have caused the child's injuries during the initial investigation, it was "incredulous that now that [R.H.] is hospitalized and in poor condition, without the ability to communicate, that [the father] now has gone from 'wondering' whether . . . [R.H.] caused the injuries to being more conclusive that the child must have been injured by [R.H.]." Accordingly, the court found it troubling that petitioner took no real action to identify the child's abuser even in the face of testimony from medical professionals. Additionally, petitioner was aware that R.H. had "good days and bad days" at the time of the petition's filing, and the court questioned why she would have allowed R.H. to care for the child.

The court also addressed the parents' other theories for the child's injuries, including one speculating that the child could suffer from osteogenesis imperfecta, a condition that Dr. Faraon testified affects bones and can cause them to easily fracture. However, the court ordered the child be tested for the condition and the results indicated that she does not suffer from it. Similarly, the child's family nurse practitioner undermined petitioner's other theory, that the child suffered her injuries during birth. According to the family nurse practitioner, the child's ribs likely would not have been broken during birth, given their pliability. Further, it is unlikely that the child's head

4

was injured during birth, given that the only noted injury at birth was a hematoma on the child's head that resolved within two days. As such, the court found by clear and convincing evidence that either or both of the parents committed abuse and/or neglect by inflicting injury on the child or failing to protect and ensure the safety and wellbeing of the child. While the court noted that the parents acknowledged that "something had to happen to their child," neither one acknowledged that the child was abused. As such, the circuit court adjudicated petitioner as an abusive and/or neglectful parent.

In June of 2020, the circuit court held a dispositional hearing. Based upon the evidence, the court found that although petitioner acknowledged that something happened to cause the child's injuries and identified R.H. as "a potential alleged perpetrator," it was not persuaded that she "took any real steps to firmly identify the child's abuser." This was based on the fact that "at the extremely vulnerable age of approximately two . . . months old [the child] suffered significant injuries, which varied in healing stages and remain completely unexplained." According to the court, petitioner offered various explanations for the child's injuries during the proceedings, all of which lacked credibility and contradicted the medical evidence presented. The court recognized that petitioner testified that she suspected that R.H. could have caused the injuries, but that this did not amount to a definitive identification of the child's abuser. Moreover, the court found it curious that, following the dispositional hearing, petitioner wrote a letter to the court alleging that R.H. made statements such as "I wish I would die so you can get [the child] back" and "I don't want to hold babies because I have nightmares about dropping the baby," yet failed to offer any testimony to that effect at either the adjudicatory or dispositional hearings. In fact, the court found that "it is apparent that if [R.H.] caused the injuries to the child the family has gone to great lengths to protect her at the expense of the infant child." Based on the foregoing, the court found that it could not ensure the child's safety if returned to petitioner and the father. Accordingly, the court denied petitioner's motion for an improvement period, finding that the child was particularly susceptible to future abuse or neglect due to her serious medical conditions. Further, because of petitioner's failure to acknowledge the abuse and neglect at issue, the court found that the problem was untreatable and that there was no reasonable likelihood that the conditions could be substantially corrected. Therefore, the court terminated petitioner's parental rights.[3] It is from the dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire

---

[3]The father's parental rights were also terminated. The permanency plan for the child is adoption in the current foster home.

5

evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

At the outset, it is important to note that although petitioner argues that adjudication, denial of an improvement period, and termination of her parental rights were all in error, she raises only a single assignment of error and addresses all three issues through the lens of this Court's prior direction concerning situations in which a child suffers physical injury and the parent takes no steps to identify the perpetrator of the abuse. According to petitioner, the circuit court's rulings on all three issues were erroneous because they were based on an inappropriate interpretation of the Court's prior holdings. We begin by finding that, in regard to adjudication, it is unnecessary to resolve petitioner's specific argument because the record shows that in addition to its findings related to the child's physical abuse and petitioner's failure to identify the perpetrator, the circuit court also found that petitioner failed to properly supervise the child. Petitioner does not challenge this finding on appeal. Therefore, even if the Court were to assume that petitioner was correct in her challenge to the court's ruling related to her failure to identify the child's abuser, she would still be entitled to no relief.

Indeed, petitioner ignores the fact that the circuit court specifically found that she failed to provide the child with proper supervision. This finding is supported by extensive evidence that the child was seriously injured on more than one occasion. Ignoring the court's findings related to physical abuse and the unknown perpetrator thereof, it is abundantly clear that the child, who suffered multiple broken bones,[4] did not receive proper supervision. According to West Virginia Code § 49-1-201, a "neglected child" is one "[w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent . . . to supply the child

---

[4]In her reply, petitioner asserts that because the DHHR did not include allegations about the child's broken ribs or tibia in the petition or file an amended petition that "the question in this case strictly involves the head injury." We note, however, that petitioner cites to no point in the proceedings below where she objected to the introduction of this evidence, thereby waiving this argument on appeal. "'Our general rule is that nonjurisdictional questions . . . raised for the first time on appeal, will not be considered.' *Shaffer v. Acme Limestone Co., Inc.*, 206 W.Va. 333, 349 n. 20, 524 S.E.2d 688, 704 n. 20 (1999)." *Noble v. W. Va. Dep't of Motor Vehicles*, 223 W. Va. 818, 821, 679 S.E.2d 650, 653 (2009). Further, petitioner's argument on this point is legally flawed. In its petition, the DHHR alleged that the child suffered nonaccidental physical trauma. That it later uncovered additional evidence in support of this allegation does not necessarily require the filing of a new petition. Indeed, this Court has explained that "facts developed after the filing of the petition, or amended petition, may be considered in evaluating the conditions which existed at the time of the filing of the petition or amended petition." *In re Brandon Lee B.*, 211 W. Va. 587, 590, 567 S.E.2d 597, 600 (2001).

with necessary . . . supervision." Assuming that petitioner did not physically abuse the child, the record is clear that the child's health was substantially harmed by petitioner's failure to supply the child with proper supervision. For these reasons, we find that petitioner is entitled to no relief in regard to her assertion that the circuit court erred in taking adverse action against her in the form of adjudication.

Petitioner's remaining arguments can be resolved by addressing the circuit court's consideration of the evidence she cites in support of her lone assignment of error and the credibility determinations that the court made in reaching its decisions to deny petitioner an improvement period and terminate her parental rights. Again, petitioner presents all of her arguments by focusing on this Court's prior direction in instances where a child suffers physical abuse by an unidentified perpetrator. We have previously held that

> "[p]arental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser." Syllabus Point 3, *In re Jeffrey R.L.,* 190 W.Va. 24, 435 S.E.2d 162 (1993).

Syl. Pt. 4, *In re Harley C.,* 203 W. Va. 594, 509 S.E.2d 875 (1998). According to petitioner, she identified R.H. as a possible abuser as soon as the DHHR initiated its investigation and remained steadfast in her belief that R.H. caused the abuse throughout the entirety of the proceedings. It is important to note, however, that the evidence does not support petitioner's position. On appeal, petitioner asserts that very early in the DHHR's investigation, she and the father "presented a theory that [R.H.] . . . may have done something to cause [the child's] injuries." However, the portion of the record to which petitioner cites in support of this assertion simply indicates that the father "wondered if his mom did anything." This is hardly the emphatic identification of R.H. as the child's abuser that petitioner claims she made. Petitioner also cites to testimony from a DHHR worker at the dispositional hearing in which the worker acknowledged that "the parents identified [R.H.] to the initial CPS [w]orker, and to law enforcement." Further, petitioner testified at the dispositional hearing that "[f]rom the first day" she "t[old] people . . . that it was a possibility that [R.H.] might have been the cause" of the child's injuries. This constitutes the entirety of petitioner's testimony as to her identification of R.H. as the perpetrator of the abuse at issue. The circuit court considered this evidence and found that petitioner did not take any real steps to identify the child's abuser, and we agree.

As set forth above, petitioner asserted multiple possibilities for the child's injuries throughout the proceedings, all of which conflicted with the available medical evidence. In short, petitioner attempts to isolate the limited instances in which she suggested that R.H. could have committed the abuse from the other instances in which she suggested that the child's extensive, severe injuries could have been caused by something as mundane as the seated child rocking back into a wall. The court explicitly found that these explanations lacked credibility, and we decline to disturb this finding on appeal. *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997). ("A reviewing court cannot assess witness credibility through a record.

7

The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). Further, the fact that the petitioner asserted various other scenarios to explain the child's injuries (*e.g.* that the family's dogs knocked the child over while in a walker, bumped into her cradle, or knocked her bouncy seat into a sofa) supports the circuit court's findings that petitioner not only failed to "take any real steps" to identify the abuser but, in fact, failed "to acknowledge or recognize that [her] child was subjected to multiple instances of physical abuse." The circuit court also highlighted the fact that petitioner waited until after the final dispositional hearing to assert in a letter that she believed R.H. caused the injuries based on certain statements petitioner alleges R.H. made. As the circuit court noted, it was telling that petitioner never presented this information during any of the many hearings during the proceedings.

On appeal, petitioner's argument, in essence, is that circumstantial evidence supports that R.H. could have injured the child. But she ignores the fact that circumstantial evidence supports that either she or the father could have injured the child. In short, only three people had access to the child during the relevant timeframe and the evidence establishes that the child's injuries were nonaccidental. Simply suggesting that R.H. could have caused the injuries, without more, is insufficient to show that petitioner identified the abuser, especially in light of the fact that petitioner failed to acknowledge that any physical abuse occurred. As such, we find no error in the circuit court's determination that petitioner failed to identify R.H. as the perpetrator of that abuse. Given that petitioner's remaining arguments are predicated on her assertion that this finding was erroneous, it is clear that petitioner is entitled to no relief.

Indeed, petitioner's failure to acknowledge that the child suffered severe physical abuse resulted in the circuit court having no choice but to deny her motion for an improvement period and terminate her parental rights. As this Court has held,

> [f]ailure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). Here, the record shows that petitioner failed to acknowledge that any abuse occurred. As the circuit court found, petitioner admitted that something happened to the child, but she failed to accept that the cause was abuse, even in the face of direct medical evidence that the child suffered nonaccidental trauma that resulted in multiple broken bones in various stages of healing. Given these extensive and severe injuries, it is obvious that something occurred, but petitioner's refusal to accept that the child was abused resulted in the underlying problem being untreatable. Since this renders an improvement period an exercise in futility, we find no error in the circuit court's denial of petitioner's motion for the same. Indeed, we have routinely held that "[t]he circuit court has the discretion to refuse to grant an improvement period when no improvement is likely." *In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002).

Petitioner's refusal to accept responsibility for this abuse also supports the circuit court's termination of her parental rights. As the circuit court found, petitioner's conduct resulted in

there being no reasonable likelihood that she could substantially correct the conditions of neglect in the near future and made termination necessary for the child's welfare. Pursuant to West Virginia Code § 49-4-604(c)(6), a circuit court may terminate parental rights upon these findings. Further, this Court has held that termination of parental rights

> "may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, in part, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). As such, we find no error in the termination of petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its August 5, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**: March 16, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton