**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **A.B.-1**

**No. 21-1029** (Marion County 19-JA-82)

**MEMORANDUM DECISION**

Petitioner Father A.B.-2, by counsel Ryan C. Shreve, appeals the Circuit Court of Marion County's November 23, 2021, order terminating his parental rights to A.B.-1.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem, John R. Funkhouser, filed a response on behalf of the child in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in adjudicating him as an abusing parent, denying his motion for an extension of his post-adjudicatory improvement period or a post-dispositional improvement period, and in terminating his parental rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

The proceedings below began in July of 2019, when the DHHR filed its initial petition and obtained legal and physical custody of the child. We note, however, that the DHHR's initial petition was not included in the appendix record on appeal.

In December of 2019, the DHHR filed an amended petition alleging that the child's mother tested positive for cocaine and marijuana upon admission to the hospital to give birth to the child in July of 2019. The mother admitted to daily marijuana use while pregnant and also to snorting

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because the child and petitioner share the same initials, we will refer to them as A.B.-1 and A.B.-2, respectively, throughout this memorandum decision.

cocaine "every few days," including the day prior to giving birth. The mother also admitted to "a lot of opioid use during her pregnancy." There were issues identifying the child's father, but Child Protective Services ("CPS") was eventually able to determine that petitioner signed a paternity affidavit on August 12, 2019, and a new birth certificate was issued on September 3, 2019. According to the amended petition, since August of 2019, petitioner had not contacted the DHHR to inquire about the child or attempt to obtain custody of him. In fact, the DHHR alleged that petitioner actively avoided CPS workers who left notice at his home that he needed to contact the DHHR by October 25, 2019, or legal action would be taken against him. Although petitioner left a voicemail for the DHHR on that date, attempts to respond to petitioner were unsuccessful. When the DHHR was eventually able to speak with petitioner, he stated that he did not know if he was the child's father and that he was not willing to take responsibility for the child until paternity testing confirmed as much. Petitioner advised that he was not associating with the child's mother and would not let the mother be around the couple's older child, A.B.-3, since she was ordered to not have contact with the child.[2] According to the record, the DHHR received notification from the Bureau for Child Support Enforcement indicating that petitioner was A.B.-1's biological father on December 11, 2019. Ultimately, the DHHR alleged that petitioner abandoned the child.

According to the DHHR, when petitioner was informed in December of 2019 that he was the child's father, he told the CPS worker that he would call back but never did. He also failed to answer calls to appear for a multidisciplinary team ("MDT") meeting. When CPS eventually spoke to petitioner again, he indicated that he was "processing" the news that he was the child's father and failed to inquire about the child's well-being or the possibility of visitation.

In January of 2020, petitioner was granted a preadjudicatory improvement period. The following month, CPS contacted petitioner about doing a check on his home so that he could begin overnight visits with the child. However, petitioner did not respond for approximately twenty days. At an MDT meeting on February 19, 2020, the parties agreed that petitioner would have weekend visits with partial supervision beginning as soon as possible. However, a home check needed to be completed before those visits could begin. A CPS worker arranged for an inspection of petitioner's home, but when the worker appeared for the inspection, no one was present. Later that day, petitioner informed CPS that they went to the wrong address, although petitioner never advised CPS that he moved. CPS eventually inspected the home and found it to be generally appropriate, other than the fact that it belonged to petitioner's sister, against whom the DHHR had a pending referral. According to CPS, until the referral was cleared, visits could not be started in the home.

Around this time, petitioner canceled several scheduled visits with the child and did not appear for others he had confirmed. After missing approximately eight visits in March of 2020, CPS attempted to arrange virtual visits because of restrictions necessitated by the COVID-19 pandemic. According to the worker, she was unable to get in touch with petitioner. Ultimately, petitioner's visitation provider advised that they were closing petitioner's services due to his noncompliance. After visits were cancelled, the DHHR alleged that petitioner never contacted the DHHR to inquire about the child's well-being or to request that visits resume. When the DHHR

---

[2]It does not appear that A.B.-3 was ever named in any petition in the proceedings below and, accordingly, is not at issue in this appeal.

eventually got in touch with petitioner again in May of 2020, he explained that he had not wanted to do video visits, although he failed to explain why. Petitioner also blamed his phone and health issues for missed visits and explained that he forgot that he had the CPS worker's phone number.

During an MDT meeting in June of 2020, the parties agreed to again refer petitioner for supervised visitation, and petitioner was advised that he needed to attend all visits. At an MDT meeting the following month, the parties discussed overnight visits with petitioner, provided that he confirmed where he was living and attended all his scheduled supervised visits. Petitioner then advised the DHHR via text message that he would be unable to have overnight visitation in his sister's home because she did not want to risk exposing other children in the home to COVID-19. When the worker called petitioner to discuss this issue, petitioner did not answer and never responded to a voicemail. The worker followed up again in August of 2020, but petitioner again failed to respond.

During an MDT meeting on August 19, 2020, the parties were informed that petitioner was living with the child's mother. In September of 2020, CPS became aware that petitioner's "address listed through economic services was not the same address" he provided to the CPS worker. CPS went to the address given to economic services, but petitioner no longer lived there, and a neighbor indicated that petitioner was living with the child's mother and their older child, A.B.-3, with whom the mother was ordered to have no contact. Over the next month, CPS obtained additional information that petitioner was living with the mother, including confirmation from the building manager where the apartment was located. Despite this evidence, petitioner continued to deny living with the mother and told CPS that "he was supposed to 'do the blood test and get the baby, not all this.'" During an MDT meeting in November of 2020, a service provider advised that petitioner was temporarily staying with a different sister and was in the process of obtaining his own apartment. However, when petitioner eventually provided an address for his residence, it did not match any residence he had previously identified. Because the DHHR was unable to confirm petitioner's address, it could not begin visits in his home.

In November of 2020, the DHHR moved to continue the adjudicatory hearing in order to verify petitioner's address, which the circuit court granted. In the order granting the continuance, the court directed petitioner to "allow announced and/or unannounced visits to the home and cooperate with all other reasonable requests" made by the DHHR. Following the hearing, the MDT determined that until overnight visitation could be established, petitioner's visitation with the child would be increased to eight hours per week. However, petitioner advised his service provider that he did not have the time to have two four-hour visits with the child, so the visits were reduced to five hours per week despite petitioner being informed that eight hours was required for the case.

On November 30, 2020, CPS went to an address petitioner provided them to inspect his home. The worker noted that the address provided by petitioner did not exist. On December 2, 2020, an emergency MDT meeting was held, during which CPS explained to petitioner the situation regarding trying to locate his residence. After petitioner attempted to describe how to get to the home, CPS decided to meet petitioner the following day so he could show them where the home was located. When asked why he was not willing to increase his visitation with the child, petitioner became "agitated and erratic," indicating that "he wasn't going to increase to eight hours because he wanted overnights." The parties explained to petitioner that he had to increase his visits

3

in order to demonstrate that he could begin a trial reunification and maintain custody of the child. However, petitioner "would not calm down to have a productive conversation with the MDT."

The following day, CPS workers met petitioner to inspect the home he shared with his grandmother. The worker noted that the home was clean, but it was a one-bedroom home and lacked room for two adults and two children. Petitioner advised that the two children would share an air mattress, his grandmother would sleep on the couch, and he would sleep on the floor. CPS questioned whether petitioner actually lived in the home, however, as "there were no children['s] toys in the home, no children's clothes, and no male clothes." The worker also sought to speak with petitioner's older child in order to complete the pending referral. The following day, the worker contacted petitioner to speak with the older child, but petitioner did not answer. In fact, the CPS worker continued attempting to contact petitioner over the next ten days, but was unable to make contact. Further, petitioner failed to appear for an MDT meeting roughly two weeks after this interaction. During the meeting, the parties informed petitioner's counsel that petitioner "had to confirm a home address before next week in order to begin the eight-hour visitations" and reiterated "that this needed to be an actual home that he was staying at that included the necessities for [A.B.-1] in order to pursue reunification." The parties also addressed the fact that petitioner needed to make his older child available to speak to CPS in order to assess her safety or the DHHR would be put in a position to amend the petition to include that child in the proceedings. Petitioner was given two weeks to comply, but failed to do so. Based on petitioner's refusal to comply with the DHHR's requests, the DHHR filed a second amended petition in December of 2020 in which it alleged that petitioner failed to assume custody, care, and control of the child and otherwise provide for the child's basic needs, including stable housing.

In January of 2021, petitioner advised CPS that he did not participate in visits with the child scheduled the weekend of Christmas "because he had other plans." That same month, petitioner's visits were stopped because of his failure to confirm an address where visits could occur, failure to confirm his currently scheduled visits, and his express refusal to utilize all eight hours of increased visitation. Thereafter, CPS made a referral for individualized parenting and adult life skills services because it was believed that these services could get petitioner "back on track." At an MDT hearing that month, the parties agreed to put in a new referral for supervised visitation. However, the MDT was advised that petitioner had indicated he would not participate in services. Petitioner's service provider stated that she made multiple attempts to schedule services and visits with petitioner and was unable to speak with him. Once she did contact petitioner, he advised the provider he would not participate.

The circuit court held a series of adjudicatory hearings, culminating in a hearing in April of 2021. The DHHR presented evidence consistent with the allegations in its petition, and petitioner testified on his own behalf. Ultimately, the court found that petitioner "was unable and remains unable to assume care, custody, and control of the [child] and that [petitioner] was unable to provide for the child's basic needs, including appropriate and stable housing." The DHHR moved to dismiss the allegation of abandonment, and the circuit court granted that motion. The court then granted petitioner a post-adjudicatory improvement period.

Following the granting of petitioner's second improvement period, CPS made a new referral for supervised visits between petitioner and the child. However, petitioner's service

provider attempted to contact petitioner from May 20, 2021, to June 14, 2021, but petitioner would not respond. He finally contacted the provider on June 15, 2021.

In July of 2021, the court held a hearing to address petitioner's progress. It was reported that petitioner's home had been approved for visitation but that there were continuing issues with providers being able to contact petitioner to schedule the visits. The court also heard testimony that the child appeared to be in extreme distress during visits. As such, the court permitted the matter to continue for thirty days so the DHHR could continue to observe visits.

In August of 2021, the court held another hearing on petitioner's improvement period, at which time it found that he failed to successfully complete the same. Following this hearing, petitioner's services were again closed because he had not appeared for several weeks and was making no progress during visits.

In September and October of 2021, the court held dispositional hearings, during which service providers testified to the difficulty in contacting petitioner to arrange visits and his lack of an emotional response to the child being distraught during visits. According to the record, petitioner did not comfort the child when he was upset and there was no emotional connection or bond between petitioner and the child. Two providers indicated that they did not believe petitioner was capable of caring or providing for the child unsupervised. The record further shows that the child "scream[ed], yell[ed], and hit to avoid going to visit[s]" with petitioner and demonstrated this behavior on several occasions. The provider and the child's grandmother explained that the child was so distraught about having to visit petitioner that they believed he would be physically harmed if they continued forcing him into his car seat.

Based on the evidence, the court found that since before petitioner began participating in the case, the MDT was never able to increase visitation to more than four hours and was never able to begin partially supervised or overnight visitation due to ongoing issues with petitioner. According to the court, at petitioner's last visit with the child in August of 2021, petitioner was "nowhere near reunification" with the child. The court further found that there was no bond between petitioner and the child. Accordingly, the court found that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect in the near future. Additionally, the court found that petitioner had not established a substantial change in circumstances such that granting an additional improvement period would be appropriate. Finally, the court found that the child required permanency and his best interests necessitated termination of petitioner's rights, as adoption would best serve the child's needs and required termination. As such, the court terminated petitioner's parental rights.[3] It is from the dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

_____

[3]The mother's parental rights were also terminated. The permanency plan for the child is adoption in the current placement.

5

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner first alleges that the circuit court erred in adjudicating him upon insufficient evidence. According to petitioner, he was, at all times, prepared to assume custody of the child, but claims that the DHHR "would not allow [him] to actually attempt to assume care, custody, and control of his child . . . because it had not been satiated." Petitioner argues that "[t]he source of the allegations in the amended petition stem from the preconditions set by the . . . DHHR . . . such that the . . . DHHR created the conditions of which it complained." These arguments, however, do not entitle petitioner to relief.

Contrary to petitioner's assertions, the record shows that it was petitioner who created the conditions that resulted in his adjudication. Before these proceedings were initiated, petitioner failed to exercise his parental rights to the child, despite having acknowledged his paternity in an affidavit in August of 2019. Once the proceedings began, the DHHR attempted to transfer the child from its legal custody to petitioner's, but the record shows that petitioner simply refused to facilitate that transfer. Without belaboring the procedural history of the case, the record overwhelmingly shows that petitioner refused to remain in contact with the DHHR in order to facilitate visits with the child and so that the DHHR could ensure the child's safety in his care. The record also shows that the DHHR expended substantial effort in furtherance of its stated goal of transitioning the child into petitioner's care, but it was petitioner's refusal to cooperate that resulted in the filing of the second amended petition and the inability to reunify him with the child.

Further, petitioner argues that the evidence shows that he obtained appropriate housing, prior to adjudication, but we again disagree. It speaks volumes about petitioner's frustration of the process that something as simple as providing the DHHR with his residential address took months. During that time, petitioner provided the DHHR with the address of one sister who had an open CPS case and refused to permit petitioner to have visits with the child in the home. At other times, the DHHR obtained substantial evidence that petitioner and his older child were living with the child's mother, despite the fact that she was ordered to have no contact with their older child. When the DHHR later inspected a different residence that petitioner identified as his own, the DHHR observed no evidence that petitioner actually resided in the home. Simply put, the circuit court heard all of the evidence upon which petitioner relies on appeal to assert that he remedied the issues of abuse and neglect by obtaining an appropriate home prior to adjudication, including his

assertion that the DHHR refused to view his belongings in the basement of his building or otherwise appear for a follow-up inspection, and found it lacking when compared with the DHHR's evidence in support of adjudication. This is a credibility determination that we refuse to disturb on appeal. *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations.").

According to West Virginia Code § 49-1-201,

> "[n]eglected child" means a child . . . [w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent . . . to supply the child with necessary food, clothing, shelter, supervision, medical care, or education, when that refusal, failure, or inability is not due primarily to a lack of financial means on the part of the parent.

Here, the DHHR presented ample evidence that petitioner never provided for the child, including before the petition was filed, before the DHHR included allegations against him, and after the petition was amended to include allegations of his own abuse and neglect of the child. In short, petitioner's argument that the DHHR created a condition in which he was unable to provide for the child is meritless, as the record shows that despite numerous attempts, the DHHR was unable to transfer custody of the child to petitioner because of its inability to ensure for the child's safety in his care, including his inability to provide suitable housing.

Petitioner also argues that the DHHR and the court "appear[ed] to mix the successes and failures of a parent engaging with services in a pre-adjudicatory improvement period with grounds for adjudication." According to petitioner, "this is not the purpose of an adjudicatory hearing, and the . . . evidence at adjudication was wholly insufficient." We find this argument unavailing, as this Court has clearly instructed that conduct that occurs during a preadjudicatory improvement period may be considered at adjudication. Specifically, we have explained that

> [a]lthough *State v. Julie G.*[, 201 W.Va. 764, 500 S.E.2d 877 (1997)] indicates that a child abuse or neglect case must be decided upon conditions existing at the time of the filing of the petition, or, by implication, in a case such as the present case, the amended petition, the clear import of *State v. Julie G.* is that facts developed after the filing of the petition, or amended petition, may be considered in evaluating the conditions which existed at the time of the filing of the petition or amended petition.

*In re Brandon Lee B.*, 211 W. Va. 587, 590, 567 S.E.2d 597, 600 (2001). In that case, we went on to explain that "[u]nlike the situation in *State v. Julie G.*, . . . the court in the present case actually amended the petition to include in the scope of concern the conduct of Brandon Lee B.'s mother, Carrie Q.B., after the filing of the original petition." Clear from this discussion is the fact that when the DHHR amends a petition to include conduct that occurred during the proceedings, as the DHHR did below, that conduct can serve as the basis for a proper adjudication. Accordingly, petitioner is entitled to no relief in this regard.

Further, we have explained as follows:

> "[West Virginia Code § 49-4-601(i)], requires the [DHHR], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing [evidence].' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the [DHHR] is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).

Syl. Pt. 1, *In re Joseph A.*, 199 W. Va. 438, 485 S.E.2d 176 (1997) (citations omitted). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *In re F.S.*, 233 W. Va. 538, 546, 759 S.E.2d 769, 777 (2014). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *Id.* As set forth above, the DHHR introduced ample evidence of petitioner's inability to assume custody of the child because of his refusal to cooperate with the DHHR and his failure to provide for the child, including a failure to provide stable housing. Accordingly, we find no error in his adjudication.

Next, petitioner argues that the circuit court erred in terminating his parental rights. In support, petitioner asserts that the DHHR admitted that he obtained appropriate housing by the dispositional hearing. However, petitioner ignores the fact that several service providers testified that they did not believe petitioner was capable of caring for the child without supervision. This opinion was based, in part, on the fact that petitioner lacked a bond with the child and showed no emotional connection when the child was visibly distraught. As set forth above, the record shows that the circuit court adjudicated petitioner upon his failure to provide for the child's basic needs. While this included a lack of stable housing, it encompassed a broader range of issues than petitioner is willing to acknowledge on appeal. In short, the fact that petitioner may have obtained appropriate housing was simply not determinative of whether he corrected the conditions of abuse and neglect at issue.

Further, this Court has repeatedly stressed that "the level of interest demonstrated by a parent in visiting his or her children while they are out of the parent's custody is a significant factor in determining the parent's potential to improve sufficiently and achieve minimum standards to parent the child." *In re Katie S.*, 198 W. Va. 79, 90 n.14, 479 S.E.2d 589, 600 n.14 (1996) (citations omitted). While it is true that petitioner did engage in some visits with the child, the record overwhelming demonstrates his disinterest in taking advantage of all the visitation offered below. Not only did petitioner refuse to cooperate in order for the DHHR to approve overnight visits with the child, but he also refused to increase his visits to eight hours per week and often cancelled or missed visits with no valid excuse. Simply put, the record shows that petitioner lacked the necessary interest in visiting with the child to achieve a bond between the two and to demonstrate the potential to achieve minimum standards to parent the child. Indeed, petitioner failed to respond appropriately to the child's distress, prompting multiple providers to opine that he was unable to care for the child without supervision. While petitioner focuses on his perceived improvements during the proceedings, this Court has stressed that "'[i]n a contest involving the custody of an

infant the welfare of the child is the polar star by which the discretion of the court will be guided.' Syl. Pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W.Va. 302, 47 S.E.2d 221 (1948)." Syl. Pt. 3, *In re S.W.*, 233 W. Va. 91, 755 S.E.2d 8 (2014). We agree with the circuit court that the evidence established that termination of petitioner's parental rights was necessary for the child's best interests.

The circuit court also found that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect in the near future. On appeal, petitioner asserts that this finding was in error because he alleges that he corrected the conditions by obtaining a home. As set forth above, this argument is unavailing, given that petitioner's issues encompassed more than simply a lack of housing and extended to a general failure to provide for the child's basic needs. Petitioner also relies on our recent decision in *In re S.C.*, 245 W. Va. 677, --, 865 S.E.2d 79, 92 (2021), in which we explained that termination under West Virginia Code § 49-4-604(c)(6) "must be anchored by a finding that there is '[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected.'" Petitioner's reliance on this case, however, is misplaced. As set forth above, the court made this finding upon substantial evidence, while in *S.C.*, the circuit court did not make a finding in this regard. *Id.* Further, we went on to find that

> considering Petitioner's current ability to care for the child and conduct throughout these proceedings, we find that the evidence does not support this finding. Petitioner remedied the conditions that led to his adjudication, and the psychologist who evaluated him had no concerns regarding his ability to provide adequate parenting for the child. By all accounts, his visitation with the child continues to be positive and their relationship is growing.

*Id*. Contrary to the parent in *S.C.*, petitioner did not remedy the conditions that led to his adjudication, several service providers expressed concerns about his ability to care for the child absent supervision, and visitation was extremely distressing for the child. As such, petitioner cannot be entitled to relief by relying on that decision.

According to West Virginia Code § 49-4-604(c)(6), a circuit court may terminate a parent's parental rights upon finding that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected in the near future and when necessary for the child's welfare. As set forth above, the circuit court had ample evidence upon which to base these findings. Further, we have also explained as follows:

> "Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). As such, we find no error in the termination of petitioner's parental rights.

9

Lastly, petitioner argues that he should have been entitled to either an extension of his post-adjudicatory improvement period or a post-dispositional improvement period. According to petitioner, he established a substantial change in circumstances by obtaining housing such that either option would have been appropriate. We do not agree. First, West Virginia Code § 49-4-610(6) provides that an extension to an improvement period may only be granted when, among other conditions, the extension is otherwise consistent with the best interests of the child. Here, the court found that the child required permanency after the protracted delays, meaning petitioner could not be entitled to an extension of his post-adjudicatory improvement period. Second, although it is true that petitioner was eventually able to obtain a home where he would have been able to visit with the child, the record also shows that his services were closed for roughly the third time shortly before disposition because of his continued lack of participation. According to West Virginia Code § 49-4-610(3)(D), in order to obtain a post-dispositional improvement period after obtaining a prior improvement period, petitioner was required to demonstrate a substantial change in circumstances that would cause him to be likely to fully participate. Given that his services had been terminated yet again shortly before disposition, petitioner could not satisfy this burden. Finally, it is important to note that, at the time of the dispositional hearing, the child had been in his current placement for twenty-six months. As we have explained,

> [a]lthough it is sometimes a difficult task, the trial court must accept the fact that the statutory limits on improvement periods (as well as our case law limiting the right to improvement periods) dictate that there comes a time for decision, because a child deserves resolution and permanency in his or her life, and because part of that permanency must include at minimum a right to rely on his or her caretakers to be there to provide the basic nurturance of life.

*State ex rel. Amy M. v. Kaufman*, 196 W. Va. 251, 260, 470 S.E.2d 205, 214 (1996). Accordingly, we agree with the circuit court that further delays in establishing permanency for the child were unwarranted.

For the foregoing reasons, we find no error in the decision of the circuit court, and its November 23, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: May 12, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn